UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIGHTEDGE TECHNOLOGIES, INC.,

Plaintiff,

v.

SEARCHMETRICS, GMBH., et al.,

Defendants.

Case No. 14-cv-01009-HSG

**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING AS MOOT MOTION FOR LEAVE TO AMEND**

Re: Dkt. Nos. 159, 173

On March 4, 2014, Plaintiff BrightEdge Technologies, Inc. ("BrightEdge") brought this patent infringement action against Defendants Searchmetrics, GmbH. and Searchmetrics, Inc. (collectively, "Searchmetrics"). *See* Dkt. No. 1. The operative complaint asserts infringement of United States Patent Nos. 8,135,706 ("the '706 Patent"), 8,478,700 ("the '700 Patent"), 8,478,746 ("the '746 Patent"), 8,577,863 ("the '863 Patent"), and 8,671,089 ("the '089 Patent") (collectively, "the Asserted Patents"). Dkt. No. 154 ("Compl.") ¶ 5. The Asserted Patents relate to search engine optimization ("SEO"), a process by which an entity can enhance its online presence. *See id.*

On October 18, 2017, Defendants moved for judgment on the pleadings, asserting lack of patent-eligible subject matter under 35 U.S.C. § 101. Dkt. No. 173 ("Mot."). On November 8, 2017, Plaintiff responded. Dkt. No. 183 ("Opp."). Defendants replied on November 20, 2017. Dkt. No. 187 ("Reply"). The Court held a hearing on December 14, 2017. *See* Dkt. No. 201. After careful consideration, the Court **GRANTS** the motion.[1]

---

[1] The factual background relevant to the Court's disposition is set forth in Part II of this order.

United States District Court
Northern District of California

## I.     LEGAL STANDARDS

### A.     Motion for Judgment on the Pleadings

Under Federal Rule of Civil Procedure ("Rule") 12(c) a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." "Judgment on the pleadings is proper when, taking all allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006). "Rule 12(c) is functionally identical to Rule 12(b)(6) and . . . the same standard of review applies to motions brought under either rule." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (quotation omitted). The Court will "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Patent invalidity under section 101 presents a question of law. *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014). "[A] district court may resolve the issue of patent eligibility under Section 101 by way of a motion for judgment on the pleadings." *Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1078 (N.D. Cal. 2016), *aff'd*, 684 F. App'x 971 (Fed. Cir. 2017). Accordingly, claim construction is not required prior to the disposition of Defendants' motion. *See Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (affirming grant of dispositive motion prior to claim construction); *accord Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718–20 (Fed. Cir. 2014).

Plaintiff contends that Defendants must show patent-ineligibility by "clear and convincing" evidence. Opp. at 7. This Court and others have rejected that argument, noting the absence of Federal Circuit or Supreme Court authority applying that standard to section 101 validity issues. *See OpenTV, Inc. v. Apple, Inc.*, No. 14-CV-01622-HSG, 2015 WL 1535328, at *3 (N.D. Cal. Apr. 6, 2015) (citing *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014); *Ultramercial, Inc.*, 772 F.3d at 709; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014)); *see also Papst Licensing GmbH & Co. KG*, 193 F. Supp. 3d at 1079 ("Several courts have concluded that a heightened burden of proof makes little sense in the context of a motion to

2

United States District Court
Northern District of California

dismiss or motion for judgment on the pleadings, and therefore declined to apply the clear and convincing evidence standard."). "[W]hile a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the section 101 calculus." *Ultramercial, Inc.*, 772 F.3d at 721 (Mayer, J., concurring) (internal citation omitted). "Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied— any presumption of eligibility." *Id.* at 720–21.

Because the section 101 determination entails an examination of the claims on their face, rather than the weighing of evidence, it is unclear how a heightened evidentiary standard is applicable. Notwithstanding this arguable ambiguity, "[n]o Supreme Court or Federal Circuit post-*Alice* decision has definitively ruled on whether the clear and convincing standard applies when evaluating patent-eligible subject matter at the motion to dismiss stage." *Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, No. 3:16-cv-02787, 2016 WL 6834614, at *5 (N.D. Cal. Nov. 21, 2016). Whichever standard applies, the Court finds for the reasons detailed below that Defendants have met their burden of proving invalidity.

### B. Section 101 Patent-Eligible Subject Matter

Section 101 of the Patent Act describes the scope of patentable subject matter as encompassing "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. It is well settled that laws of nature, natural phenomena, and abstract ideas are excluded from the universe of patentable subject matter. *See Alice Corp. Pty.*, 134 S.Ct. at 2354. These categories are not patent-eligible because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S.Ct. 1289, 1293 (2012) (citations omitted). Allowing patent claims for laws of nature, natural phenomena, and abstract ideas would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Id.* at 1293. However, the Supreme Court has also recognized the need to "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice Corp. Pty.*, 134 S.Ct. at 2354.

The Supreme Court and Federal Circuit have articulated a two-part test for determining

whether a claim's subject matter is patent-eligible. First, a court "determine[s] whether a claim is 'directed to' a patent-ineligible abstract idea." *Content Extraction & Transmission LLC*, 776 F.3d at 1346–47 (citing *Mayo Collaborative Servs.*, 132 S.Ct. at 1296–97). If so, the Court then "consider[s] the elements of the claim—both individually and as an ordered combination—to assess whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea." *Id.* at 1347. "This is the search for an 'inventive concept'— something sufficient to ensure that the claim amounts to 'significantly more' than the abstract idea itself." *Id.* (quoting *Mayo Collaborative Servs.*, 132 S.Ct. at 1294).

Two recent decisions of the Federal Circuit shed particular light on the *Alice* inquiry as applied to computer-related technology. In *Enfish, LLC v. Microsoft Corp.*, the Federal Circuit found it "relevant to ask whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea, even at the first step of the *Alice* analysis." 822 F.3d 1327, 1335 (Fed. Cir. 2016). "[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Id.* (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)). As set forth in *Enfish*, the key question is "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1335–36.

Published less than a week after *Enfish*, *In re TLI Commc'ns LLC Patent Litig.* ("*TLI*") emphasized that claims are drawn to an abstract idea if they are directed to "the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two." 823 F.3d 607, 612 (Fed. Cir. 2016). Thus, claims that describe "a new telephone, a new server, or a new physical combination of the two" are not abstract, but claims that describe a system and methods in "purely functional terms" without "any technical details for the tangible components" are abstract. *Id.*

Following *Enfish* and *TLI*, the Federal Circuit further refined the *Alice* inquiry as it applies

4

to computer-related claims. For instance, in *McRO, Inc. v. Bandai Namco Games Am., Inc.*, the Federal Circuit defined the key inquiry as "whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." 837 F.3d 1299, 1314 (Fed. Cir. 2016). In performing this analysis, the Court "must focus on the language of the asserted claims themselves," and "complex details from the specification cannot save a claim directed to an abstract idea that recites generic computer parts." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016). To determine whether the "claim's character as a whole is directed to excluded subject matter" the Court evaluates the claimed "advance" over the prior art. *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1325 (Fed. Cir. 2017) (quotation omitted). The Court is to "examine earlier cases in which a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016).

## II.     DISCUSSION

Defendants argue that the Asserted Patents fail at both steps of the *Alice* inquiry. Defendants contend at step one that the Asserted Patents are directed to the abstract and longstanding concept of enhancing marketing effectiveness by "gathering data and performing mathematical calculations." Mot. at 11. At step two, Defendants argue that the Asserted Patents fail to recite a saving inventive concept that transforms the claimed method into a patentable application of the abstract idea. *See id.* at 21–25. Plaintiff asserts that Defendants oversimplify the Asserted Patents, and ignore crucial claim limitations reciting an inventive concept. Opp. at 10–25. Plaintiff divides the five Asserted Patents into three groups based on patent families. *See id.* at 2. The Court's analysis of the Asserted Patents tracks Plaintiff's division.

### A.     Group 1: The '706 and '746 Patents

The '706 and '746 Patents (collectively, the "Group 1 Patents") share a common specification and are each entitled "Operationalizing Search Engine Optimization." These patents "claim a channel-centric solution" to "assessing the effectiveness of a website's marketing

efforts." Opp. at 2–3. The channel-centric solution "focuses on analyzing the many possible channels that might lead a visitor to the website." Opp. at 3. That solution builds on the prior "website-centric" approach to evaluating search engine performance. *See id.* at 2–3. The website-centric approach "relied on a company's website determining the search term that led each visitor to visit the website." Opp. at 2; *see* '706 Patent, 1:25-32. That reliance made it difficult for web content owners and designers to discern how many visitors came to web page based on the search terms used and/or or the web page's rank on a search engine. '706 Patent, 1:27-29. These individuals would consequently "estimate how visitors come to the Web Page and what they do once they are on the Web Page." *Id.* at 1:42-46. That estimation obscured "which actions would present a better chance for success of the Web Page." *Id.*

The Group 1 Patents remedy this gap in data assessment by reciting "[s]ystems and methods for determining shares of voice, both for the entity and other entities, with respect to selected search terms across channels and over time." *Id.* at 2:53-55. Plaintiff explains that "shares of voice is a ***specific, calculated numerical value that represents an entity's visibility on the network*** as compared to other entities, such as competitors." Opp. at 3 (emphasis in original). Plaintiff contends that the underlying "shares of voice" calculation is: "an entity's aggregate share value divided by the total of all of the aggregate share values for the entities."[2] Opp. at 12 n.3; *see* '706 Patent, 7:24-27 ("The aggregate share values for all the entities referenced in the search may then be combined and the share of voice for each calculated at step 250 by dividing each entity's aggregate share value to the total of all the aggregate share values.").

Plaintiff highlights independent claim 1 of the '706 and '746 Patents as exemplifying the claimed method. *See* Opp. at 12–13. Defendant likewise cites these claims as representative. Mot. at 2–3. The Court agrees that independent claim 1 of each Group 1 Patent is representative, and that it can properly rely on these claims in assessing the patentee's invention. *See Intellectual*

---

[2] Plaintiff states that Defendants dispute its proposed construction of "share of voice." *See* Opp. at 12 n.3. Defendants do not controvert Plaintiff's construction in either their motion or in their reply to Plaintiff's opposition. The Court need not resolve this dispute for purposes of this order. *See Huawei Techs., Co, Ltd*, 2016 WL 6834614, at *1 (relying on the plaintiff's characterizations of the underlying technology to resolve a dispositive motion prior to formal claim construction).

*Ventures I LLC*, 850 F.3d at 1330–32 & n.7.[3]

Claim 1 of the '706 Patent states:

> 1. A method for managing references to an entity on a network, comprising:
>
>> ***determining*** shares of voice for an entity and other entities across a plurality of channels with respect to a plurality of search terms, wherein determining shares of voice includes determining rank positions for the search terms with respect to the entity and the other entities and multiplying the rank positions by products of estimated click rates and volumes of traffic on the network for the entity and the other entities;
>>
>> ***correlating*** shares of voice for the entity and the other entities with respect [sic] the search terms to determine a relative change in share of voice for the entity with respect to the other entities;
>>
>> ***correlating*** shares of voice for the entity across the plurality of channels to determine relative changes in share of voice for the entity within each of the channels; and
>>
>> ***displaying*** the relative change in share of voice for the entity with respect to the other entities and the relative changes in share of voice for the entity within each of the channels.[4]

'706 Patent, 14:17-38. Claim 1 of the '746 Patent sets forth the same "channel-centric" method, though it specifies that this method is computer implemented. *See* '746 Patent, 14:22-50 ("A computer implemented method of managing references to an entity on a network, the computer including a non-transitory computer storage medium, the method comprising. . ."). By implementing the claimed method, an entity can more accurately assess its relative performance in the market. *See* '706 Patent, 7:28-53, 8:19-33.

---

[3] Despite citing these same claims as exemplary, Plaintiff disputes Defendants' characterization of these claims as representative. *See* Opp. at 8–9. Plaintiff fails to cite claims that would call into question Defendants' identification; rather, the handful of claims which Plaintiff identifies recite the same general method without meaningful difference or limitation. *See id.* The Court agrees with Defendants, and adopts their designation of representative claims. Even assuming these claims are not representative, the Court has reviewed the remaining claims and concludes nothing in those claims alters the Court's analysis. *See Intellectual Ventures I LLC*, 850 F.3d at 1330–32 & n.7.

[4] Emphasis added unless otherwise noted.

### i. *Alice* Step One

The Group 1 Patents fail at *Alice*'s first step. These patents are directed towards an abstract idea: improving market performance via data aggregation and analysis. The claimed method recites steps to gather and organize data, and analyze that data via mathematical calculation. These types of activities, i.e. data collection, modeling, and evaluation, constitute "longstanding conduct that existed well before the advent of computers and the Internet." *See Intellectual Ventures I LLC*, 850 F.3d at 1326–27 (finding methods reciting an index-searchable database abstract); *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) (finding a filtering system for Internet content abstract); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (finding a process to generate a device profile abstract because it "describe[d] a process of organizing information through mathematical correlations and is not tied to a specific structure or machine").

The Group 1 Patents, moreover, propose no new physical or technical improvement. The claims instead describe the "methods in purely functional terms." *TLI*, 823 F.3d at 612; *see Alice Corp. Pty.*, 134 S.Ct. at 2351. The specification's emphasis on "managing" and "optimizing" web page performance underlines that conclusion. *See id.* The specification does not describe any new "tangible components"; instead, the Internet is merely a "conduit" for the abstract idea of data analysis to enhance market performance. *Id.; see, e.g.*, '706 Patent, 4:1-6 ("In at least one example, the network 105 includes the Internet. . . Alternatively or additionally, the network 105 includes one or more cellular RF networks . . .").[5] As Defendants illustrate for each step of independent claim 1, Mot. at 12–14, the claimed method can be performed entirely with a pen and paper.[6] The Federal Circuit has "treated analyzing information by steps people go through in their

---

[5] The specification situates this discussion of the "network" within the system as a whole: "In at least one implementation, the network 105 can be used to connect the various parts of the system 100 to one another, such as between a web server 110, a deep index engine 120, a correlator 130, grouping engine 140, and a forecasting engine 150." '706 Patent, 3:11-16.

[6] For instance, Defendants provide the following hypothetical to illustrate how one could "determine[e] shares of voice for an entity and other entities across a plurality of channels with respect to a plurality of search terms," '706 Patent, 14:20-23: "Alice works for clothing outlet store X. Alice searches Google for results paid by companies (paid search) and for results based on relevancy (organic search) (the plurality of channels) using the search terms "clothing outlet" and "clothing store." She looks at the search results from Google for each search term, and writes

1  minds, or by mathematical algorithms, without more, as essentially mental processes within the

2  abstract-idea category." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir.

3  2016).

4  　　　In concluding that the Group 1 Patents fail at this step, the Court is guided by the Federal

5  Circuit's instruction to "compare claims at issue to those claims already found to be directed to an

6  abstract idea in previous cases." *Enfish, LLC*, 822 F.3d at 1344; *see Amdocs (Israel) Ltd.*, 841

7  F.3d at 1294. The Court observes that several district courts have understood the above cited

8  precedents similarly in invalidating analogous patents. *See GoDaddy.com LLC v. RPost*

9  *Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 3165536, at *8–13 (D. Ariz. June 7,

10  2016), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017) (invalidating a patent "directed to the abstract idea

11  of collecting and providing information" that used an "authenticator" applying a "mathematical

12  association method" to enhance message delivery and correspondence); *OpenTV, Inc. v. Netflix*

13  *Inc.*, 76 F. Supp. 3d 886, 892–93 (N.D. Cal. 2014) (invalidating as abstract a patent that claimed

14  methods to gather data and create custom advertising based on that data); *Morsa v. Facebook, Inc.*,

15  77 F. Supp. 3d 1007, 1013 (C.D. Cal. 2014), *aff'd*, 622 F. App'x 915 (Fed. Cir. 2015)

16  (invalidating a patented method for targeting online advertisements based on culled user

17  information, and creating a corresponding bidding system for advertisers); *Collarity, Inc. v.*

18  *Google Inc.*, No. CV11-1103-MPT, 2015 WL 7597413, at *4–8 (D. Del. Nov. 25, 2015)

19  (invalidating a patent to enhance online searching that recited methods to generate, refine, and

20  suggest keywords based partly on a user's past queries). These cases reflect a line of precedent

21  that: (1) classifies data collection, organization, and analysis as abstract—even where that

22  produces new data—in the absence of a claimed technological improvement; and (2) distinguishes

23  between tangible improvements to technology on the one hand, and improvements to an entity's

24  *business performance* on the other. The Group 1 Patents fall within these two abstract idea camps:

25  

26  in her notebook rankings (*i.e.*, how high in the list of the search results) store X's home website,
    competitor store Y's home website, and competitor store Z's home website each appear. Alice

27  finds information from the Google search engine regarding how many people perform searches for
    the search terms "clothing outlet" and "clothing store." She also receives information indicating

28  how often a user, after performing a search, follows the link to each of store X, store Y, and store
    Z's home website, from Google." Mot. at 12.

they seek to improve an entity's online market share through data aggregation and analysis without reciting a tangible improvement to existing technology.

Of the cases presented by Defendants, the Court finds particularly persuasive *PUREPREDICTIVE, Inc. v. H20.AI, Inc.*, No. 17-CV-03049-WHO, 2017 WL 3721480 (N.D. Cal. Aug. 29, 2017). *See* Mot at 8–11. In *PUREPREDICTIVE*, a court in this District found a patent reciting a "predictive analysis factory" directed to an abstract idea. *See PUREPREDICTIVE, Inc.*, 2017 WL 3721480, at *5. The patent recited the following three-step method:

> First, it receives data and generates "learned functions," or, for example, regressions from that data. See '446 Patent at 8:66–9:12. Second, it evaluates the effectiveness of those learned functions at making accurate predictions based on the test data. Finally, it selects the most effective learned functions and creates a rule set for additional data input.

*Id.* at *1. In addition to this three-step method, the *PUREPREDICTIVE* patents claimed "a computer program product to perform the operations of the predictive analytics factory." *Id.* The plaintiff and patent-owner was, as here, a technology company seeking to "provide insight into [a] business's data through the use of predictive modeling." *Id.* at *2.

The *PUREPREDICTIVE* court granted the defendant's motion to dismiss under section 101. *Id.* at *7. Specifically, the court concluded that the claims of the patent were "directed to a mental process and the abstract concept of using mathematical algorithms to perform predictive analytics." *Id.* at *5 (finding also that "[t]he method of the predictive analytics factory is directed towards collecting and analyzing information"). That factory generated new data via "learned functions" did not alter the court's conclusion. These functions simply represented a "basic mathematical process of. . . running data through an algorithm" which is "not a patentable concept." *See id.* (finding similarly with regard to a "function generator module," notwithstanding fact that it could "generate hundreds, thousands, or millions of learned functions, or more"). So too with the method's subsequent steps to evaluate the effectiveness of the learned functions and create a rule based on the most effective functions—these were nothing more than mathematical processes. *Id.* While the claims recited a "computer program product," and "computer readable code," the court concluded that this merely invoked computers as a tool to implement the claimed

method.  *Id.*  The court distinguished *Enfish* and *McRO* on this basis, as the patents in those cases claimed "a specific improvement on an existing computer-related technology."  *Id.*

Though not cited by the parties, the Court also finds instructive the Federal Circuit's decision in *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089 (Fed. Cir. 2016).  There, the Federal Circuit addressed the issue of section 101 validity as applied to a patent disclosing "ways to detect fraud and misuse by identifying unusual patterns in users' access of sensitive data."  839 F.3d at 1092.  The court described the patented method as:

> collect[ing] information regarding accesses of a patient's personal health information, analyz[ing] the information according to one of several rules (i.e., related to accesses in excess of a specific volume, accesses during a pre-determined time interval, or accesses by a specific user) to determine if the activity indicates improper access, and provid[ing] notification if it determines that improper access has occurred.

*Id.* at 1093.

The *FairWarning* court found the claimed method was patent-ineligible.  Specifically, the method was directed to a "combination" of two "abstract-idea categories": (1) "collecting information, including when limited to particular content"; and (2) "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes."  *Id.* at 1093–94 (quotations omitted).  The court distinguished the claimed rules from those held patent-eligible in *McRO*, explaining that the latter were "directed to 'a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type.'"  *Id.* at 1094 (citing 837 F.3d at 1314).  The claimed rules in *FairWarning*, in contrast, did not themselves purport to improve a technological process.  *Id.*  Instead, they relied on the use of a computer to enhance the existing technological infrastructure "by allowing the automation of further tasks."  *Id.*  The *FairWarning* court likewise found the claimed method before it distinct from the self-referential table in *Enfish*.  *See id.* at 1095 (citing 822 F.3d at 1337).  While the self-referential table in *Enfish* was "directed to a specific improvement to the way computers operate," the method before the *FairWarning* court was an abstract idea implemented on a computer.  *Id.*

Apart from cursory references to *Enfish* and *McRO*, Plaintiff does not present a single case

supporting a finding of patentability at step one. *See* Opp. at 10–19. For the reasons discussed, *Enfish* and *McRO* are distinguishable based principally on the absence of a specific asserted improvement to technology here. Plaintiff does argue that *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC* is distinguishable at step two. *See* Opp. at 21 (citing 874 F.3d 1329 (Fed. Cir. 2017)). But *Two-Way* supports the Court's finding of an abstract idea at step one.[7]

In *Two-Way*, the patents at issue "relate[d] to a system for streaming audio/visual data over a communications system like the internet." *Id.* at 1333. The patentee's claimed "multicasting" system "provid[ed] a way to transmit one packet of information to multiple recipients" without overloading the network. *Id.* In so doing, the multicasting system avoided a shortcoming of prior "unicast" systems. *Id.* The patents presented the multicasting system as "an improved scalable architecture for delivering real-time information." *Id.*

The claimed multicasting system failed at both steps of the *Alice* analysis. At step one, the Federal Circuit affirmed the district court's finding that that the patentee's "method for routing information" was directed to the abstract idea of "(1) sending information, (2) directing the sent information, (3) monitoring the receipt of the sent information, and (4) accumulating records about receipt of the sent information." *Id.* at 1337. The court highlighted that the patent used "result-based functional language" like "converting," "routing," "controlling," "monitoring," and "accumulating records," without "sufficiently describ[ing] how to achieve these results in a non-abstract way." *Id.* The court noted that the plaintiff's proposed constructions failed to indicate how the claimed scalable architecture "itself leads to an improvement in the *functioning* of the system." *Id.* at 1338 (emphasis in original).

These precedents belie Plaintiff's suggestion that the claimed method's application to the Internet removes it from the realm of the abstract. *See* Opp. at 13–14. "An abstract idea on 'an Internet computer network' or on a generic computer is still an abstract idea." *BASCOM Glob. Internet Servs., Inc.*, 827 F.3d at 1348; *accord Ultramercial, Inc.*, 772 F.3d at 716 ("[T]he use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101.").

---

[7] The Court addresses Plaintiff's step two arguments in Part II(A)(ii) below.

That the underlying algorithm at some point requires that an individual access the Internet or another network does not alter that conclusion. *See* Opp. at 18.

The Court similarly rejects Plaintiff's representation that the Group 1 Patents are patent-eligible because they claim an "Internet-based solution to solve a problem unique to the Internet." Opp. at 14. For that proposition, Plaintiffs cite the portion of *Intellectual Ventures I LLC v. Capital One Bank (USA)* in which the Federal Circuit distinguished the claims before it from those in *DDR Holdings. See* 792 F.3d 1363, 1371 (Fed. Cir. 2015) (citing 773 F.3d at 1255)*.* In so doing, Plaintiff elides a key distinction drawn by the *Intellectual Ventures* court between the patent-ineligible claims in that case and the claims presented in *DDR Holdings.* Namely, that the "*claimed solution*" in *DDR Holdings* "used a series of steps that *created a hybrid web page* incorporating 'look and feel' elements from the host web site with commerce objects from the third-party web site." *See id.* Thus,

> [t]he patent at issue in *DDR* provided an Internet-based solution to solve a problem unique to the Internet that (1) did not foreclose other ways of solving the problem, and (2) recited a specific series of steps that resulted in a departure from the routine and conventional sequence of events after the click of a hyperlink advertisement.

*Id.*

That distinction likewise applies here. To be sure, the Group 1 Patents may address a problem related to the Internet. But these patents do not create a specific technological improvement akin to a hybrid web page, i.e. a new digital pathway, triggered by a user's online activity. Indeed, Plaintiff does not dispute that the claimed calculations can be performed with a pen and paper. And it cannot be sufficient for section 101 that the function of data collection requires use of a computer and/or logging into the Internet. "At best, that narrowing is an 'attempt[ ] to limit the use' of the abstract guarantee idea 'to a particular technological environment,' which has long been held insufficient to save a claim in this context." *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed. Cir. 2014) (citing *Alice Corp. Pty.,* 134 S.Ct. at 2358; *Mayo Collaborative Servs.,* 132 S.Ct. at 1294; *Bilski v. Kappos,* 561 U.S. 593, 610–11 (2010); *Diamond v. Diehr*, 450 U.S. 175, 191 (1981)).

The Group 1 Patents' recitation of "computer instructions" and "computer implementation" also fails to show a tangible technological improvement at step one. For instance, independent claim 11 of the '706 Patent recites: "A system for optimizing online references to an entity, the system comprising: a ***processor*** configured to execute ***computer instructions*** to cause the system to perform operations, the operations comprising. . ." '706 Patent, 15:7-12. The claim then sets forth the aforementioned reference management method. *See id.* at 15:13-38. But the claim language does not specify how to configure or execute the otherwise undefined "computer instructions" to perform the claimed method. The claim does not recite any other specific improvement to technology. The claim's reference to "a processor" that is configured to execute these instructions amounts to nothing more than generic computer implementation. *See Enfish, LLC*, 822 F.3d at 1335–36; *McRO, Inc.*, 837 F.3d at 1314. The patentee's method here is therefore distinct from the self-referential table in *Enfish*, and the specific animation rules recited in *McRO*. *See id.*

So too with independent claim 1 of the '746 Patent. That claim states:

> 1. A ***computer implemented method*** of managing references to an entity on a network, the computer including a non-transitory computer storage medium, ***the method comprising***:
>
> ***determining*** a score for each of a plurality of search terms with respect to an entity and one or more other entities, the score for each of the plurality of search terms for the entity being based on at least a position of a reference to the entity within search results generated using the respective search term and
> the score for each of the plurality of search terms for the entities being based on at least a position of a reference to the other entities within the search results generating using the respective term;. . .

'746 Patent, 14:22-31. Again, the claimed "computer implemented method" does not recite a tangible technological improvement: it merely sets forth the remainder of the abstract method already discussed. *Id.* at 14:32-50. Other claim references to computer elements suffer from this same deficit. *See id.* at 15:14-19 (claiming "[a] computer readable medium encoded with a computer program fixed in a non-transitory computer storage medium having computer-executable instructions for causing a computing system to perform operations of optimizing online references to an entity" by performing the same data collection and analysis steps), 16:28-17:70

14

(claiming "[a] computer implemented method of managing references to an entity on a network" through the claimed method). The instruction to apply the abstract idea of data aggregation and market analysis "using some unspecified, generic computer is not '*enough*' to transform the abstract idea into a patent-eligible invention." *Alice Corp. Pty.*, 134 S.Ct. at 2359 (internal citation omitted) (emphasis in original).

Arguing that Defendants overlook claim limitations at step one, Plaintiff cites a handful of dependent claims that it argues provide "specific technical solutions" to remedy the prior art's shortcomings. *See* Opp. at 11–13 & 12 n.4. While the dependent claims provide additional methods for data collection, aggregation, and analysis, none transform these otherwise abstract processes into patentable subject matter. *See buySAFE, Inc.*, 765 F.3d at 1355 ("The dependent claims' narrowing . . . of such long-familiar commercial transactions does not make the idea non-abstract for section 101 purposes."). For instance, Plaintiff cites dependent claim 8 of the '746 Patent as showing "different specific ways of determining 'share of voice,'" by requiring share of voice be multiplied by "a sentiment correction, a geography based correction, or a volatility based correction." Opp. at 12 n.4; *see* '746 Patent, 15:4-8. But that claim's reference to "corrections" simply requires evaluating (1) the change in search results over time, '746 Patent, 14:53-58, and (2) search results "associated with different geographic locations," '746 Patent, 14:51-52. Like Plaintiff's method more broadly, gauging market performance based on geography and historical patterns of consumer behavior is a conventional or routine practice that existed long before the Internet. *See OpenTV, Inc.*, 76 F. Supp. 3d at 893 ("The concept of gathering information about one's intended market and attempting to customize the information then provided is as old as the saying, 'know your audience.'"); *Morsa*, 77 F. Supp. 3d at 1013 (recognizing that entities "targeted consumers based on their demographic data long before the internet existed").

That analysis likewise applies to dependent claims 2–10 of the '706 Patent. These claims merely identify different ways to collect data (e.g., by accounting for variation over time, geographic location, and web source), and different ways of analyzing data (e.g., by "crawling" the data to identify keywords, "grouping keywords identified during the crawling step," and "performing a keyword frequency analysis on the pages crawled"). '706 Patent, 14:39-15:6. This

does not winnow the claimed method to provide anything more than equally abstract variations on data collection and analysis. *See Two-Way Media Ltd.,* 874 F.3d at 1337–39. For instance, the claims do not describe how "crawling" is performed or what a "keyword frequency analysis" comprises. While Plaintiff asserts that requiring claim specificity confuses the novelty and enablement inquiries, *see* Opp. at 19, "[t]he § 101 inquiry must focus on the language of the Asserted Claims" even at step one. *Synopsys, Inc.*, 839 F.3d at 1149. In the absence of narrowing language, the Court finds that the Group 1 Patents are directed towards an abstract idea.

### ii. *Alice* Step Two

So finding, the Court proceeds to the "inventive concept" step. *See Intellectual Ventures I LLC*, 850 F.3d at 1325. "In applying step two of the *Alice* analysis, we must 'determine whether the claims do significantly more than simply describe [the] abstract method' and thus transform the abstract idea into patentable subject matter." *Id.* at 1328 (quoting *Ultramercial, Inc.*, 772 F.3d at 715). The inventive "additional features" must be more than "well-understood, routine, conventional activity" previously known in the industry. *Mayo Collaborative Servs.*, 132 S.Ct. at 1298; *Content Extraction & Transmission LLC*, 776 F.3d at 1347–48.

Plaintiff argues that the Group 1 Patents, by elaborating a channel-centric approach, "identify and overcome specific problems with conventional, prior art solutions to assessing the effectiveness of a website's marketing efforts." Opp. at 20. According to Plaintiff, the inventive concept embodied in these claims is "***analyzing***" the "***many possible channels that might lead a visitor to the website by the claimed 'shares of voice' both across multiple channels and over time***." *Id.* at 21 (emphasis in original). Plaintiff argues that claim 1 of the Group 1 Patents sets forth this inventive concept. *Id.*

Claim 1 of the '706 Patent indicates that the shares of voice calculation includes (1) "determining rank positions for the search terms with respect to the entity and other entities"; and (2) "multiplying the rank positions by products of estimated click rates and volumes of traffic on the network for the entity and other entities." '706 Patent, 14:22-27. Shares of voice is then "correlate[d]" "with respect [to] the search terms to determine a relative change in share of voice for the entity and other entities." *Id.* at 14:28-31. The next step is to "correlat[e] shares of voice

16

for the entity" across channels to determine relative share of voice changes within each channel. *Id.* at 14:32-34. Finally, the relative share of voice change is displayed with respect to performance across entities and channels. *Id.* at 14:35-38. Claim 1 of the '746 Patent recites a similar method for determining shares of voice, but specifies that the method is "computer implemented." *Id.* at 14:21-50.

These claims, on their own or as an ordered combination, do not transform the instant invention into patentable subject matter. The claims simply set forth a conventional process for collecting and analyzing information via a mathematical process. *See, e.g.*, *Collarity, Inc.*, 2015 WL 7597413, at *8–11 (holding that a method for "refining user Internet search queries" was not made patent-eligible by claims specifying keyword generation and suggestion based partly on past results); *Intellectual Ventures I LLC*, 850 F.3d at 1326, 1328–29 (concluding that a method to create an index-searchable database defined by "a plurality of XML tags" failed to impart an inventive concept). Plaintiff expressly states that "shares of voice"—a key difference over the prior art—is just a calculated measurement. Opp. at 12 n.3. And that measurement is itself a product of aggregating and organizing data using existing technology and source information. While claims of the Group 1 Patents refer to "computer implementation," or "computer instructions," those generic invocations do not impart an inventive concept. *See Two-Way Media Ltd.*, 874 F.3d at 1338 ("Merely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention."); *Mortgag. Grader Inc. v. First Choice Loan Serv. Inc.*, 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (finding that claims disclosing a "network," "interface," and "database" added only generic computer components that did not impart an inventive concept).

At step two, Plaintiff does not present even a single dependent claim to cabin the scope of the patented method. *See* Opp. at 20–23. Instead, Plaintiff merely quotes verbatim claim 1 of each Group 1 Patent. *See id.* But those claims fail to state with sufficient specificity *how* a web content owner would, for instance, rank search terms, select channels from the plurality of channels, and correlate shares of voice. *See Elec. Power Grp., LLC*, 830 F.3d at 1356 (finding that claims failed to state an inventive concept where they "specif[ied] what information . . . is

17

desirable to gather, analyze, and display. . . but they do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology"). Again, the *Two-Way* court's analysis is instructive. In *Two-Way*, the Federal Circuit found "no saving inventive concept" in the representative claims at step two. 874 F.3d at 1338–39 (observing that "[w]hile the specification may describe a purported innovative 'scalable architecture,' claim 1 of the '187 patent does not"). The court stressed that the claims failed to "specify[] the rules forming the communication protocol or specifying parameters for the user signal." *Id.* The court also noted that the claimed method "uses a conventional ordering of steps—first processing the data, then routing it, controlling it, and monitoring its reception—with conventional technology to achieve its desired result." *Id.* at 1339.

In its own review of the dependent claims, the Court finds nothing that narrows the representative claims to impart anything more than variations on the abstract idea of data collection and analysis. As discussed at step one, no inventive concept manifests in dependent claims 2–10 of the '706 Patent, or in dependent claim 8 of the '746 Patent, as these claims merely specify that the method accounts for (1) changes in search results based on geography and over time, and (2) the past behavior of a web page visitor. *See* '746 Patent, 14:51-58; '706 Patent, 14:39-15:6. In the absence of additional claim language, the "functional" and "result-focused" character of the claims renders the instant invention patent-ineligible. *Elec. Power Grp., LLC*, 830 F.3d at 1356.

Plaintiff stresses that the claimed method is innovative because it offers a more accurate way to assess web performance. But Plaintiff does not dispute that web content owners could already access all of the data sources cited in the claim language, e.g., blogs, social networks, and discussion forums, and analyze those sources over time. *See* Opp. at 21–22; '706 Patent, 14:47-54. The specification itself lays plain that the recited claims simply provide for the analysis of existing information, just in a more efficient way. *See, e.g.*, '706 Patent, 1:42-44, 1:50-53 ("Currently, the Web Page owner must choose which strategy to follow with limited information on which would be more effective."). That the claimed method might be "effective" does not

change that it recites a routine and conventional method of market analysis. *See PUREPREDICTIVE, Inc.*, 2017 WL 3721480, at *5–7 ("[J]ust because a computer can make calculations more quickly than a human does not render a method patent eligible.").

Finally, Plaintiff contends that the Patent Trade and Appeals Board's (PTAB) decision not to institute *inter partes* review suggests an inventive concept. Opp. at 22–23. That argument fails. To begin, Plaintiff acknowledges that the issue before the PTAB was whether the asserted claims of the Group 1 and 2 Patents were "anticipated or obvious over the prior art." Opp. at 5–6. Plaintiff admits that the section 101 search for an "inventive concept" is "indisputably" distinct from assessing novelty under section 102. *Id.* at 22 (citing *Synopsys, Inc.*, 839 F.3d at 1151). Federal Circuit precedent firmly supports that view. *See Two-Way Media Ltd.*, 847 F.3d at 1339–40 ("Eligibility and novelty are separate inquiries."); *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1263 (Fed. Cir. 2016) (finding that "even assuming" that the plaintiff's invention was novel "does not avoid the problem of abstractness").[8] Based on the representative claims, the Court finds the asserted claims of the Group 1 Patents invalid under section 101.

## B. Group 2: The '700 Patent

The '700 Patent is entitled "Opportunity Identification and Forecasting for Search Engine Optimization." Like the Group 1 Patents, the '700 Patent seeks to remedy shortcomings of the website-centric approach. *See* Opp. at 3–4. In particular, Plaintiff highlights that the prior approach lacked a method for comparing how a visitor arrived at a web page, and whether the visitor subsequently purchased something from that web page. *See id.* at 14; '700 Patent, 1:40-43. Owners and designers of web pages were consequently required to "estimate how visitors have come to the Web Page and what they do once they are on the Web Page." '700 Patent, 1:44-46.

The '700 Patent remedied this gap in data assessment by reciting a "correlator that 'can determine how visitors are directed to the entity and how visitors behave once there.'" Opp. at 4

---

[8] The Court accordingly **DENIES** Plaintiff's request for judicial notice as irrelevant. *See* Opp. at 6 n.1; *Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (denying a request for judicial notice because the documents to be noticed were not relevant); *Two-Way Media Ltd.*, 847 F.3d at 1339–40 (affirming the district court's decision to exclude evidence relating to novelty and obviousness as not relevant to "whether the claims were directed to eligible subject matter").

(citing '700 Patent, 5:2-5). In addition, the '700 Patent scores "the entity's references in search results using those terms, and correlat[es] that data with data related to visitors' behavior on the website, such as the value of resulting conversions." *Id.*[9] Plaintiff asserts that "[b]y analyzing that information, the system can identify search terms for investigation and use probabilistic models to forecast the increase in conversions that might result from improving the scores for the identified search terms." Opp. at 15. Plaintiff cites independent claim 1 as exemplary of the invention. *See id.* Defendants likewise identify that claim as representative. Mot. at 4. The Court agrees that the claim is representative. *See infra* n.3.

Claim 1 sets out a multistep "method for optimizing online references to an entity that are non-paid advertisements, the method comprising":

> ***searching at least one channel unassociated with paid advertisements on a network for references to the entity*** unassociated with paid advertisements using a plurality of search terms from the plurality of references to the entity to generate search results that include a plurality of references;
>
> ***scoring the references*** to the entity associated with each of the plurality of search terms from the plurality of references to generate scores for the references to the entity;
>
> ***correlating conversions by one or more visits to a website of the entity through the reference with the search terms that directed the visits to the entity*** to determine a conversion rate;
>
> ***determining a total value for the conversions*** to the entity;
>
> ***correlating at least the total value of the conversions*** to the entity associated with the references to the entity and the scores for the references to the entity and the scores for the references to the entity to identify one or more of the plurality of the search terms; and
>
> for the identified one or more of the plurality of search terms, ***forecasting*** an increase in conversions for the references to the entity associated with an increase in the scores for the references to the entity.

'700 Patent, 9:1-23. Independent claim 11 recites these same steps but specifies: "A non-transitory computer readable storage medium configured to cause a system to perform operations

---

[9] Defendants assert, and Plaintiff does not dispute, that conversion in this context can relate to how many visitors purchase something on a website. *See* Mot. at 16.

of optimizing online references to an entity that are non-paid advertisements, the operations comprising. . .." '700 Patent, 10:12-15.

Like the Group 1 Patents, the '700 Patent is aimed at the abstract idea of improving business performance through data aggregation and analysis. The '700 Patent itself claims no technological improvement, and sets forth a result-focused and functional method. *See TLI*, 823 F.3d at 612; *Elec. Power Grp., LLC*, 830 F.3d at 1356. Those functions—using search terms to evaluate web references, comparing total web page visitors to online purchasers, and forecasting how a company can increase its market share based on that data—fall within the two abstract-idea categories of: (1) data gathering and analysis, and (2) mathematical calculation, without more. *See FairWarning IP LLC*, 839 F.3d 1093–94. Term searching and performance forecasting are simply cosmetic variations of these abstract concepts. *See Collarity, Inc. v. Google Inc.,* 2015 WL 7597413, at *8; *PUREPREDICTIVE, Inc.*, 2017 WL 3721480, at *5. Plaintiff does not dispute that the '700 Patent's correlation function trades on a known probabilistic model that assumes "a higher ranked search result will lead to an increase of conversions." *See* Mot. at 16; Opp. at 4, 15. As discussed in Part II.A, that independent claim 11 recites generic computer implementation cannot save the '700 Patent under section 101. *See TLI*, 823 F.3d at 612.

Though overlapping with step two, Plaintiff argues at step one that Defendants ignore specific requirements set forth in dependent claim 4 of the '700 Patent. Dependent claim 4 states that keywords can be identified by "crawling previously returned search results and conducting a keyword frequency analysis to identify at least some of the plurality of keywords." '700 Patent, 9:32-34. As with the Group 1 Patents' recitation of "crawling," this patent likewise elides how "crawling" is performed, or what a "keyword frequency analysis" entails. *See Two-Way Media Ltd.,* 874 F.3d at 1338–39; *Elec. Power Grp., LLC*, 830 F.3d at 1356. So too with claim 1, which does not explain how one selects terms, scores references, determines the value of "conversions," or "correlates" any of the above, as required for "forecasting." As to the claimed "correlator" that performs a "correlating" function, the claims omit what analytical procedure "correlating" requires. *See GoDaddy.com LLC*, 2016 WL 3165536, at *12 (finding that claims disclosing an "authenticator" did not save a patented message verification method because the claims failed to

state "what the 'authenticator' actually is" or how the device functioned beyond requiring that claimed steps "be performed by an amorphous 'mathematical association method'").

Plaintiff does not offer any dependent claims that shed meaningful light on these functions. *See* Opp. at 23–24. At the "inventive concept" step, Plaintiff simply (1) quotes verbatim the language of independent claim 1, and (2) cites Defendants' "failed IPR petition" as a recognition of an inventive concept. *See id.* The Court finds these arguments unpersuasive for the reasons discussed. Nothing in the dependent claims, including dependent claim 4, recites a saving inventive concept. As with the Group 1 Patents, the asserted claims of the '700 Patent are therefore invalid under section 101.

## C. Group 3: The '089 and '863 Patents

The '089 and '863 Patents (collectively, "the Group 3 Patents") share a common specification and are entitled "Correlating Web Page Visits and Conversion with External References." Plaintiff explains that "[l]ike the '700 Patent, the '089 and '863 Patents address the shortcomings of the prior art" in part by disclosing a "correlator." Opp. at 5; *see* '089 Patent, 6:30-36. The correlator "can determine the number of conversions on a website that are due to a particular external reference." '089 Patent, 6:31-33. The specification explains the advance over the prior art:

> Correlating conversions by a visitor on a Web Page with an external reference can allow a webmaster to determine which external references are best at producing conversions. For example, a webmaster can determine which search results are most likely to result in desired conversions and can, therefore, focus marketing efforts on improving those search results. . .

'089 Patent, 6:43-48. Plaintiff highlights as exemplary independent claim 1 of the '089 Patent, which Defendants also identify as representative. *See* Opp. at 16–17; Mot. at 5.[10] The Court agrees that the claim is representative. *See infra* n.3. That claim states:

> 1. A method of ***correlating an external reference*** to one or more entry web pages ***with one or more conversions*** performed as a

---

[10] The '863 Patent has just one asserted independent claim. *See* '863 Patent, 16:48-17:7. Plaintiff does not dispute that this patent is a "continuation of the '089 patent and describes the same way to provide information." Mot. at 6; *see* Opp. at 4–5, 16–17.

result of visits to the entry web pages ***to provide information regarding an effectiveness of an organic marketing campaign***, the method comprising:

***Identifying a plurality of entry web pages***;

by a computing device, ***identifying a plurality of visitors*** to the entry web pages;

by a computing device, ***identifying a plurality of conversions*** performed as a result of visits to the entry web pages, each conversion performed by one of the visitors;

by the computing device, ***analyzing information*** regarding the conversions and the visits, wherein the information regarding the conversions and the visits were generated by an independent system;

by the computing device, for each visit to one of the entry web pages, ***identifying an organic referral*** originating from a search engine that directed the one of the visitors associated with the respective visit to the web page, wherein identifying the organic referral from the search engine comprises ***parsing a referral header*** associated with the entry web page;

by the computing device, ***requesting***, using one or more keywords, ***organic search results from the search engine*** that originated the organic search referral;

by the computing device, ***receiving the organic search results from the search engine***; and

by the computing device, ***analyzing the organic search results*** to determine rank positions of the entry web pages; and

by the computing device, ***determining a correlation*** between the rank positions of the entry web pages, the conversions, and the keywords.

'089 Patent, 16:41-17:6. According to Plaintiff, this claim describes a "very specific process for performing" an "analysis of the particular search results that led visitors the website and generated conversions." Opp. at 16. Plaintiff highlights that the process requires (1) "identifying an organic referral that directed each visitor to the web page by parsing a referral header"; (2) "requesting and analyzing search results from the search engine that originated the organic referral" by using keywords; and (3) "determining a correlation between the rank possessions of the entry web pages, the conversions and the keywords." Opp. at 16–17 (quotations omitted).

As with the Group 1 and 2 Patents, the Group 3 Patents are directed to the abstract idea of improving market performance through data aggregation and analysis. Representative claim 1

shows that the claimed method is functional, and fails to effect a specific technological improvement. *See, e.g.*, *FairWarning IP, LLC*, 839 F.3d at 1093–94. Courts have rejected similar variations of the claimed method, which reduces to considering a web user's past online activity and subsequent purchasing decisions. *See id.*; *Collarity, Inc.*, 2015 WL 7597413, at *8; *PUREPREDICTIVE, Inc.*, 2017 WL 3721480, at *5. While these patents may require the use of a computer to collect inputs for the method, that does not direct the patents away from an abstract idea. *See BASCOM Glob. Internet Servs.*, Inc., 827 F.3d at 1348. Like the patents in Groups 1 and 2, the claims of the Group 3 Patents do not shed light on how to "identify[]," "request[]," "analyz[e]," and "correlat[e]" so as to impart an inventive concept. *See Two-Way Media Ltd.*, 874 F.3d 1338–39; *Elec. Power Grp., LLC*, 830 F.3d at 1356. Plaintiff fails to explain how independent claim 1's instruction to "pars[e] a referral header" adds meaningful specificity at step two. *See* Opp. at 24–25. The claim language itself does not specify how to identify an organic referral, or explain what "parsing" entails. Plaintiff fails to cite other dependent claim language that would meaningfully distinguish the Group 3 Patents from the other patents-in-suit. Absent those limitations, the Court likewise concludes that the asserted claims of the Group 3 Patents fail at *Alice* step two, and are thus invalid.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the pleadings is **GRANTED.** As for Plaintiff's motion seeking leave to file a fourth amended complaint, the Court finds that motion appropriate for disposition without oral argument and deems the motion submitted. *See* Dkt. No. 159; Civ. L.R. 7-1(b). The Court **DENIES** Plaintiff's motion as moot. The Court finds that granting Plaintiff leave to amend the complaint to add a new patent would not cure the infirmities discussed above. *See* Dkt No. 159 at 2. Moreover, the efficiency benefits to which Plaintiff points—namely, coordinating case events as to the proposed new claims and the existing claims—no longer exist, because the Court has granted judgment for Defendants as to all of the claims asserted to date. *See* Dkt. No. 181 at 2 (explaining that "[t]he '770 Patent will share documentary evidence, facts, witnesses, claim terms and construction, experts, and technology

tutorial(s) with other asserted patents in this case").

To the extent Plaintiff wishes to assert new patents, it should file a new lawsuit. The clerk is directed to enter judgment in accordance with this order in favor of Defendants and to close the case.

**IT IS SO ORDERED.**

Dated: 1/19/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge